**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DARIUS SMITH,** | ) | |
| | ) | |
| Plaintiff**,** | ) | |
| | ) | |
| v. | ) | **Case No.: 4:20-cv-562-MTS** |
| | ) | |
| **GENERAL MOTORS,** | ) | |
| | ) | |
| Defendant**.** | ) | |

## GENERAL MOTORS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS

Defendant General Motors, LLC ("*GM*"), by and through its undersigned counsel, files its Statement of Uncontroverted Material Facts ("*SUMF*"), and states:

### I.   THE PARTIES

1.      Darius Smith ("*Smith*") is an African American (Black) male born in 1982[1]. *See* Deposition of Darius Smith ("*Smith Dep.*") at 12:2-8, attached hereto as *Exhibit DD*.

2.      General Motors, LLC is a limited liability company with its principal place of business in Detroit, Michigan. *See* Declaration of George Herina ("*Herina Dec*") at ¶ 3, attached hereto as *Exhibit EE*.

3.      GM operates an automobile assembly plant in Wentzville, Missouri ("*Assembly Plant*") where it produces trucks and vans. *Id*. at 4.

---

[1] In accordance with Local CM/ECF Procedure ¶ M, GM will not include personal information required to be redacted, such as Plaintiff's full date of birth, social security number and home address.

II.     SMITH'S EMPLOYMENT WITH GM

4.      Smith was hired by GM as a temporary employee on November 10, 2014. *See* Smith Dep. at 31:15-18; Acknowledgement of Condition of Temporary Assignments for Non-Seniority Employees marked as ***Exhibit B*** (GM 001965).

5.      Smith was hired as a full-time employee with seniority as of March 11, 2015. *See* Smith Dep. at 32:4-15; Entry Level Offer/Application marked as ***Exhibit C*** (GM 001966). Smith's seniority date is March 11, 2015. *Id.*

6.      Smith is a current employee of General Motors, where he has been employed continuously since 2014. *See* Smith Dep. at 19:17-23; Exhibits B, C; Herina Dec. at ¶ 5.

7.      Smith's employment with GM was never interrupted or terminated (other than for approved leaves of absence or plant-wide lay-offs). *See* Herina Dec. ¶ 6. Smith's claims do not include any allegations of wrongful discharge or constructive discharge. *See* Complaint [Doc #05], generally.

8.      Smith is an hourly employee at GM, and a member of the United Auto Workers ("*UAW*") union and UAW Local 2250. *See* Smith Dep. at 22:13-16, 25:2-3.

9.      Smith understands that, as an employee of GM, his employment was subject to the terms of the contract/collective bargaining agreement between GM and the UAW. *See* Smith Dep. at 32:19-22.

10.     As a part of this litigation, Smith produced part of the collective bargaining agreement between the UAW and GM. *See* Excerpt from UAW Collective Bargaining Agreement (produced by Plaintiff) marked as ***Exhibit E*** (Smith 000030-31); Smith Dep. at 34:4-10, 35:18-20.

11.     At GM, hourly employees (like Smith) are assigned to a Group/Team Leader, generally other hourly employees, who are also union members. *See* Smith Dep. at 25:4-11, 27:7-

12. Team leader positions are assigned by seniority, and interested employees can bid on open positions. *See* Smith Dep. at 27:13-20.

12. The next level of supervision above a Group/Team Leader is a Shift Leader. There is typically one Shift Leader per shift and per department. *See* Smith Dep. at 25:12-14, 20-22.

13. There is also a Business Manager assigned to supervise each department. *See* Smith Dep. at 26:3-7.

14. Smith is employed by GM as a material handler in the Materials Department at the Wentzville Assembly Plant; in that position, he drives a fork truck (also called a fork lift). *See* Smith Dep. at 21:14-19, 22:17-23, 24:2-6; Herina Dec. ¶ 7. In his position, Smith works on the dock, and unloads trucks carrying parts being delivered to the Assembly Plant. *See* Smith Dep. at 23:18-23.

### III.     *GM's Policies Against Harassment and Discrimination*

15. GM has in place policies that prohibit unlawful discrimination, harassment and retaliation. *See* Herina Dec. at ¶ 8; GM Code of Conduct (GM 00000873-919) marked as ***Exhibit AA***. The Code of Conduct contains policies related to "Maintaining a Respectful Workplace," "Human Rights," "Workplace Violence," and also contains a link to GM's detailed Anti-harassment policy. *Id.; see also* Exhibit G.

16. Smith is aware and understands that GM has policies in place to prevent harassment, discrimination and retaliation of its employees. *See* Smith Dep. at 43:13-17.

17. Smith had in his possession prior to this litigation, a copy of GM's non-discrimination policy. *See* Smith Dep. at 37:1-9; GM's Policy Statement Regarding Diversity, Equal Opportunity, Affirmative Action, Non-Discrimination, and Sexual Harassment marked as

*Exhibit F* (Smith 000050).  Smith was aware of GM's non-discrimination  policy since the day he was hired with GM. *See* Smith Dep. at 38:2-5.

18.        Smith had in his possession prior to this litigation,  a copy of GM's anti-harassment policy. *See* Smith Dep. at 38:9 – 39:1; GM Anti-Harassment Policy marked as *Exhibit G* (Smith 000038). Smith was aware of GM's anti-harassment policy since the day he was hired with GM. *See* Smith Dep. at 39:2-4.

19.        Smith had in his possession prior to this litigation,  a copy of GM's workplace violence policy. *See* Smith Dep. at 39:8-15; GM Workplace Violence Policy marked as *Exhibit H* (Smith 000032).

20.        Smith is aware that GM maintains an AwareLine that allows employees to report suspected violations of GM's policies. *See* Smith Dep. at 40:10-17.  AwareLine complaints can be made by calling  the designated number, or by sending an email or submitting a form on the website. *See* Smith Dep. at 41:5-9.

21.        Smith admits to utilizing the AwareLine during his employment with GM. *See* Smith Dep. at 41:2-4; *see also* AwareLine Complaint  dated June 17, 2019 attached as *Exhibit P* (GM 00001973-1995).

## IV.        *SMITH'S WORK HISTORY*

22.        GM maintains records related to all employees' injury or illness as a part of its usual course of business.  A true and accurate copy of the GM Medical Records Report for Darius Smith is attached as *Exhibit BB* (GM 00002017-2048). *See* Herina Dec. at ¶ 9.

23.        Smith was off work on an approved medical leave of absence due to anxiety and depression from February 14, 2018 to April 3, 2018. *See* Exhibit BB at GM 00002034.  Smith returned to work on April 9, 2018. *Id.*

4

24.     On April 13, 2018, Smith was taken to the GM Plant Medical Department by GM Security following an incident where Smith was on the floor, anxious and crying due his Group Leader Tracy, allegedly having thrown a vest at his chest. *See* Exhibit BB at GM 00002031-2032.

25.     Smith was off work on an approved medical leave of absence due to anxiety and stress from April 14, 2018 to April 30, 2018. *See* Exhibit BB at GM 00002031-2032. Smith returned to work on May 3, 2018. *Id*.

26.     Smith was off work on an approved medical leave of absence due to an injury to his hand from January 9, 2019 to January 21, 2019. *See* Exhibit BB at GM 00002020-2021. Smith returned to work on January 22, 2019. *Id*.

27.     Smith was off work on an approved medical leave of absence due to anxiety and stress from October 28, 2019 to December 8, 2019. *See* Exhibit BB at GM 00002018-19. Smith returned to work on December 9, 2019. *Id*.

28.     Smith was off work due to a Plant-wide, temporary lay-off from January 1, 2020 to January 19, 2020. *See* Herina Dec. at ¶ 10; Smith Dep. at 256:22-258:12.

29.     Smith was off work due to a Plant-wide, temporary lay-off due to the Covid-19 Pandemic from March 23, 2020 to May 31, 2020. *See* Herina Dec. at ¶ 11; Smith Dep. at 256:22-258:12.

30.     Smith was off work on an approved medical leave of absence due to anxiety and stress from July 13, 2020 to January 19, 2021. *See* Herina Dec. at ¶ 12; Smith Dep. at 256:22-258:12.

31.     Smith was off work due to a Plant-wide, temporary lay-off from March 29, 2021 to April 11, 2021. *See* Herina Dec. at ¶ 13.

32.     Smith was off work due to a Plant-wide, temporary lay-off from April 26, 2021 to June 6, 2021. *See* Herina Dec. at ¶ 14.

33.     Smith was off work due to a Plant-wide, temporary lay-off from June 21, 2021 to August 29, 2021. *See* Herina Dec. at ¶ 15.

34.     Smith was off work due to a Plant-wide, temporary lay-off from September 6, 2021 to September 26, 2021. *See* Herina Dec. at ¶ 16.

35.     Smith was off work due to a Plant-wide, temporary lay-off from December 6, 2021 to January 23, 2022. *See* Herina Dec. at ¶ 17.

## V.      SMITH'S CLAIMS OF DISCRIMINATION AND HARASSMENT

36.     Smith alleges in his Complaint that the discrimination and harassment began in May 2015, but he believes that date may be wrong because he did not experience any issues until he moved to the Materials Department, which was not until October 2015. *See* Smith Dep. at 52:1-17; Complaint, generally [Doc #5].

37.     Smith prepared handwritten notes detailing all of the incidents that he believed constituted discrimination, harassment and retaliation. *See* handwritten notes marked as ***Exhibit K*** (Smith 000039-43), ***Exhibit L*** (Smith 000044-48), ***Exhibit M*** (Smith 000049), and ***Exhibit N*** (Smith 00001-14); *see also* Smith Dep. at 47:6-14, 49:1-17.

38.     Smith testified at his deposition that he included all relevant incidents in the handwritten notes. *See* Smith Dep. at 256:13-21. Smith testified that if he did not prepare notes for a particular period of time, it was because nothing of significance occurred during that time. *See* Smith Dep. at 256:13-21.

### a. *THE BOX CUTTER INCIDENT*

39.     Smith described the first time he allegedly experienced any form of harassment or discrimination at GM when "my union sister, Laura, came to me and told me if I asked her for another box cutter she would have Nancy, her friend, fire me." *See* Smith Dep. at 52:18-23; *see also* Charge of Discrimination marked as *Exhibit R*.

40.     At the time of the incident, Laura was also an hourly, union employee who was employed by GM as a Team Leader. *See* Smith Dep. at 53:3-16. Laura was not a manager at GM, and has/had no authority to fire any employees, including Smith. *See* Smith Dep. at 57:2-6; Herina Dec. at ¶ 18.

41.     Smith testified that Laura was not his supervisor, but instead, in her capacity as a Team Leader, she assisted in providing necessary supplies to the other hourly employees on the Team. *See* Smith Dep. at 53:3-16.

42.     Smith testified that the Box Cutter Incident occurred on May 15, 2017. *See* Smith Dep. at 187:25-188:6; Exhibit R.

43.     Smith described the Box Cutter Incident in a set of handwritten notes (Exhibit K) (Smith 00039-43); Smith Dep. 215:16-217:5. Exhibit K was signed by Smith, and dated May 23, 2017. *See* Exhibit K at Smith 000043.

44.     In describing the Box Cutter Incident, Smith wrote that it made him feel like a "prisoner or a slave." More specifically, Smith wrote:

*See* Exhibit K at Smith 00039.

**b.  *THE SAFETY VEST INCIDENT***

45.     Plaintiff alleges in his Complaint that he "was assaulted by a manager named Tracy (Last Name unknown) when she threw a safety vest at him and it struck him out of anger." *See* Complaint [Doc #5] at ¶ 11 ("***Safety Vest Incident***").

46.     Smith testified in his deposition that the Safety Vest Incident occurred on or about June 8, 2017. *See* Smith Dep. at 97:13-20, 169:23-170:4.

47.     In his Charge, Smith alleges that the Safety Vest Incident occurred on June 8, 2017. *See* Exhibit R.

48.     Smith prepared a set of handwritten notes that include a description of the Safety Vest Incident. *See* Exhibit L at Smith 000046; Smith Dep. at 221:22-223:22. Smith's notes indicate the Safety Vest Incident occurred on April 13, 2018. *Id.*

49.     According to the GM Plant Medical Records, Smith was taken to the Plant Medical Department on April 13, 2018 following an incident involving his Group Leader Tracy and a "vest." *See* Exhibit BB at GM 00002031-2032.

50.     Smith described the orange vest that they were required to wear for safety as being heavier than his shirt or a shoe, but not sharp in any way. *See* Smith Dep. at 97:23 –99: 7.

51.     The orange safety vest at issue is accurately depicted in the photographs attached as ***Exhibit CC***. *See* Herina Dec. at ¶ 19.

52.     The orange safety vest at issue weighs approximately 1 pound or less. *See* Herina Dec. at ¶ 19.

53.     According to Smith's deposition testimony, the Safety Vest Incident occurred when he told his Group Leader Tracy Cook that he needed a safety vest before the start of his shift. *See*

Smith Dep. at 103:20-104:2.   Smith described that Cook "stormed into the team center, snatched a vest off the, it was on a clothes hanger, right and she opened the door and just thrown it out the door." *See* Smith Dep. at 103:20 – 104:2.

54.    When the vest made contact with his body, he fell to the ground, and had an anxiety attack. *See* Smith Dep. at 99:22 – 100:3.

55.    Smith admitted that it was not possible to throw the vest at someone with sufficient force and strength to knock the person to the ground. *See* Smith Dep. at 100:11-17.

56.    The vest did not cause any injury to him when it hit him. Smith described that after the vest hit him, he fell to the ground and was crying on the ground. *See* Smith Dep. at 101:22-25.

57.    Smith testified that when the vest struck his body, it felt as though he had been shot. *See* Smith Dep. at 99:13-20.

58.    During his deposition, Smith testified that he tried to get a friend and co-worker to be his witness to the Safety Vest Incident, and he explained the interaction with his co-worker as follows:

> So he ride with me, so I'm confident that he a witness. So I kept on, like I asked him to be a witness. He kept on like dragging me out, dragging me out. So once I asked him about the third time, you know, I kind of felt his vibe, that you going to do something, you going to do it, I ain't got to keep asking you. So I took the time, like what's up, what's up. He's like, no, man, I can't do it, I got to think about my family. He said I talked to my wife. I said I respect that, I understand that, my brother. **But at the same time it did like hurt my feelings a little bit because you just saw the police shoot me in your face. It's like the police shot me. It's not like lying. You just tell them you saw the police shoot me. That's how I relayed that to him because that's how I looked at that, me getting hit with the vest is like a police shot me**. *See* Smith Dep. at 210:1-211:2 (emphasis added).

59.    Smith testified that, in his mind, being struck by the safety vest was the same as being shot by the police. *See* Smith Dep. at 210:1-211:2.

60.     Smith has never heard Cook use a racial slur and she never directed any racial slurs to Smith.  *See* Smith Dep. at 107:14-24.

### c. *THE MIDDLE FINGER INCIDENT*

61.     In his Complaint, Smith alleges that "Tracy also gave him the middle finger while working on the floor in front of witnesses." *See* Complaint [Doc #5] at ¶ 13 ("*Middle Finger Incident*").

62.     Smith testified in his deposition that the Middle Finger Incident involved his Group Leader Tracy Cook. *See* Smith Dep. at 68:13-16; 107:20-24.

63.     Smith prepared handwritten notes that describe the Middle Finger Incident, which he signed and dated May 7, 2018. *See* Exhibit M.  According to Exhibit M, the Middle Finger Incident occurred on May 2, 2018. *Id.*

64.     The incident occurred when Smith was driving his fork truck down one of the facility aisles. She [Tracy Cook] was parked in her buggy in aisle, so he tapped his horn to alert her that he was approaching, and she then gave him the middle finger. *See* Smith Dep. at 108:2-18.

65.     This was the first and only time Smith had seen someone at General Motors use the middle finger gesture. *See* Smith Dep. at 109:24 – 110:3.

66.     Smith interpreted that gesture as being disrespectful. *See* Smith Dep. at 111:3-23.

67.     Smith testified that having Cook flip him off "messed [him] up real bad because it like ain't what I'm supposed to be dealing with if I'm in a job. If I was on the street and I saw it on the street, it would be different because I could have handled it differently as opposed to being inside the plan. I can't handle it the way I handle it outside. . . I'm being treated unfairly by someone who supposed to always treat me with dignity and respect." *See* Smith Dep. at 111:8-23.

68.     Smith testified at his deposition that the Safety Vest Incident and the Middle Finger Incident happened approximately six months apart. *See* Smith Dep. at 115:2-8. The Safety Vest Incident occurred first followed by the Middle Finger Incident. *See* Smith Dep. at 115:9-12.

### d. THE SWASTIKA INCIDENT

69.     In his Complaint, Smith alleges that "the retaliation against him increased after he reported a Hitler sign on a door at work." *See* Complaint [Doc #5] at ¶ 14 (the "***Swastika Incident***").

70.     Smith testified that one of his co-workers showed him the swastika (Hitler sign) scratched in the paint on a door at the GM Plant. *See* Smith Dep. at 121:6-10.

71.     Smith took a photo of the swastika, and reported it to his supervisor, Jerry Thornhill. *See* Smith Dep. at 122:4-19; Smith's photograph of the swastika is marked as ***Exhibit X***; *see also* Smith Dep. at 123:3-8.

72.     The swastika was subsequently removed from the door (although he could not testify when it was removed). *See* Smith Dep. at 124:20 – 125:10.

73.     Smith admitted that he did not know the specific meaning of the swastika, but he knew "it was something bad and it wasn't supposed to have been on the door inside the plant." *See* Smith Dep. at 125:13-126:3. He was not sure if the swastika was directed to certain employees at GM because he does not understand what it means. *See* Smith Dep. at 126:8-13.

74.     He was not personally offended by the swastika, and did not know if the sign was supposed to mean something against him or not. *See* Smith Dep. at 125:20 – 126:3. He did not believe the swastika was directed to him in any way. *See* Smith Dep. at 126:4-7.

75.     He thinks that Thornhill retaliated against him for reporting the swastika. *See* Smith Dep. at 120:15-19; 127:3-6. Smith speculates that Thornhill was mad because Smith was

"snitching" but Thornhill never said anything to Smith to indicate he was unhappy, though. *See* Smith Dep. at 128:12-21; 129:2-6.

76.     Smith testified that, at the time of the swastika incident, he was on a team with approximately 9-12 employees, composed of both Black and White employees. *See* Smith Dep. at 130:8-25.

77.     The only handwritten notes that mention the Swastika Incident are dated June 2019. *See* Exhibit N (Smith 00001-14); Smith Dep. at 235:17-238:6.

### e.  COLLECTING EMPTY CONTAINERS

78.     Smith believes that, on one occasion following his report of the swastika to Thornhill, he was singled out and asked to pick up and carry away empty containers while the other employees on his team were waiting on the next truck to arrive. *See* Smith Dep. at 132:20-24. Smith was unable to identify the date or timeframe of this incident.

79.     Smith testified that this was a one-time occurrence and took him no more than twenty minutes to complete the task. *See* Smith Dep. at 147:14-18, 148:25 – 149:2.

80.     Smith testified that there were times when the team was waiting on the next truck to arrive, that the employees were allowed to talk or smoke a cigarette for about 15 minutes while they waited. It was during this "free" time on one occasion that Smith was asked by his supervisor (Thornhill) to collect the empty containers. *See* Smith Dep. at 148:9-19. Smith testified his supervisor came up to him and asked him to collect the empty containers while the rest of the employees on the team continued to talk. *See* Smith Dep. at 143:14 – 144:2.

81.     Smith admits that collecting the empty containers was something all employees are required to do; both Black and White employees alike were asked to do the task. *See* Smith Dep. at 143:14 – 144:2.

12

82.      Smith testified he felt it was unfair that he was asked to stop talking and go collect the empty containers, while the other employees continued talking. *See* Smith Dep. at 144:3-12.

83.      Smith initially testified that he believed Thornhill asked him to take out the empty containers because of his race but Thornhill never said anything that made him believe that. *See* Smith Dep. at 135:9-14. Thereafter, Smith testified that he thought his supervisor chose him for the task because "I'm a hard worker. I'm a good person." *See* Smith Dep. at 145:4-17.

### f.   *PERFORMING OTHER JOB DUTIES DUE TO LOW MAN POWER*

84.      In his Complaint, Plaintiff alleges that he was "subjected to performing tasks outside his job description or be subject to termination regularly." *See* Complaint [Doc #5] at ¶ 7.

85.      Smith testified that, on one occasion, he was asked to fill in when GM was low on manpower. *See* Smith Dep. at 73:8 – 74:1. Smith was unable to identify the date or timeframe of this incident.

86.      At his deposition, Smith described a single incident where Brandon Admire asked Smith to perform another employee's job, and he thinks he may have filed a grievance related to the incident. *See* Smith Dep. at 71:20-72:12.

87.      Smith thinks he also called the AwareLine to complain about being requested to perform other job duties when GM was low on manpower (as described above). *See* Smith Dep. at 72:18-21.

88.      Smith admitted that the incident had nothing to do with his race or racial discrimination but instead he thought it was "unfair" that he was being asked to perform other job duties. *See* Smith Dep. at 74:2-4.

89.      Smith admitted that the incident had nothing at all to do with his race. *See* Smith Dep. at 73:8 – 74:1.

### g. *PERFORMING TASKS OF A 2-PERSON JOB*

90.     During a shift, Smith's job includes unloading 18-wheeler trucks and taking the parts from the trucks to the employees on the line; he then picks up the empty parts containers and re-loads them onto the trucks. *See* Smith Dep. at 82:22 – 83:5.

91.     Smith testified that, the employees on a shift are supposed to unload approximately seven trucks per shift. *See* Smith Dep. at 83:15-19.

92.     Two people are typically assigned to unload one truck. *See* Smith Dep. at 85:10-11.

93.     On one occasion, for a few hours, Smith was asked by Dan Bold to unload a truck by himself, which resulted in him performing more work than he felt he should have to perform because the job was meant for two people not one. *See* Smith Dep. at 76:18-24; 79:4-7.

94.     Smith explained that his job supposed to have two employees assigned to unload the truck, and on this occasion, there was only one employee (him) on the job. *See* Smith Dep. at 75:11-16.

95.     By having him perform the job of unloading the truck alone, it made Smith's job more difficult both physically and mentally. *See* Smith Dep. at 76:2-5.

96.     Following the incident, Bold approached Smith and asked why he had not finished the truck, and in Smith's words, Bold was hostile. *See* Smith Dep. at 75:2-5; 78: 3-7.

97.     When asked at his deposition if Smith felt he was asked to do the extra work because he is Black and his co-worker was White, Smith responded "No, ma'am, I wouldn't say that." *See* Smith Dep. at 77:12-15.

98.     Smith first testified that no one talked to him or reprimanded him about not getting the trucks unloaded, and he received absolutely no discipline arising from the situation. *See* Smith Dep. at 86:1-13.

99.     But, later in his deposition, Smith testified that he thinks he might have been "put on notice" for the unloading incident (where he was allegedly asked to unload a truck alone even though it was normally a 2-person job) in retaliation for reporting the swastika. *See* Smith Dep. at 136:15-21. Smith said he was put on notice for not finishing a truck, but his counterpart[2] was not put on notice, and Smith testified that he thought to himself "boom, they're discriminating against me, they out to get me." *See* Smith Dep. at 138:19-25.

100.    Paragraph 16 of his Complaint that references being written up actually refers to the "verbal" notice. Smith admitted that a verbal warning at GM has no impact whatsoever on any of the terms or conditions of his employment. *See* Smith Dep. at 141:14-22.

101.    Smith described being "put on notice" as being like a verbal warning, which is not reflected on an employee's disciplinary record and results in no tangible change in employment terms or conditions. *See* Smith Dep. at 136:22 – 137:3, 141:14-22.

102.    Being "put on notice" has no disciplinary effects whatsoever - - - it is simply making the employee aware that there was a problem with performance. *See* Smith Dep. at 139:19 – 140:3.

---

[2] Smith's testimony on this incident was inconsistent on several points. Plaintiff's sole complaint related to this incident is premised on the fact that he was asked to do a 2-person job *alone*. Thus, if he was performing the job *alone*, his counterpart (which is the second person assigned to the job) was not present at the time, and there would be no reason for any so-called "notice" to the absent counterpart. Moreover, Plaintiff testified that he was asked by Dan Bold to unload the truck alone, but he does not explain why Dan Bold would retaliate against him for an earlier report to an entirely different supervisor (Thornhill) about seeing the swastika written on the door.

### h. *CURSING AND OTHER RUDE CONDUCT*

103.     Paragraph 6 of Plaintiff's Complaint alleges that Plaintiff has been regularly cussed out and subject to disparaging remarks by management. *See* Complaint [Doc #5] at ¶ 6.

104.     Jerry Thornhill is the only employee of GM that Smith recalls cursing at him. *See* Smith Dep. at 66:21 – 67:11.  Smith testified that all of his allegations related to managers at GM cursing at Smith relate exclusively to Gerald (Jerry) Thornhill.  *Id.*

105.     Smith could not recall any managers at GM who made "disparaging remarks" about him. *See* Smith Dep. at 67:22-68:1.

106.     Smith testified that he thought the allegations in his Complaint which refer to "disparaging remarks" actually related to the incidents of cursing by Jerry Thornhill.  *See* Smith Dep. at 68:2-8. When asked about the disparaging remarks made towards him by managers at GM, Smith testified that there were no other incidents besides the cursing by Mr. Thornhill, and Cook giving him the middle finger. *See* Smith Dep. at 68:23 – 69:5.

107.     Smith testified that Thornhill liked employees who "bowed down" to him and did not like the ones who did not. *See* Smith Dep. at 133:21-25.

108.     Smith admits that there are Black employees who Thornhill likes – in Smith's opinion, the ones who will bow down to him. *See* Smith Dep. at 133:21-25

109.     Smith described Thornhill as not being "professional."  *See* Smith Dep. at 151:2-8. But, Smith admits that he has seen Thornhill have a nice conversation with another Black employee named Judd. *See* Smith Dep. at 151:14-22. According to Smith, Thornhill got along well with Judd. *See* Smith Dep. at 152:2-5.

110.     Smith also testified that another hourly, union co-worker (Tim Williams) was disrespectful. *See* Smith Dep. at 182:8-25; 185:8-187:3.

111.    Smith testified that Williams "talked crazy to pretty much everybody," and it was not because Smith is Black. *See* Smith Dep. at 207:24-208:10.

112.    In June 2019, Smith prepared a set of hand-written notes that he testified he gave to his UAW representative and other unidentified individuals at GM. *See* Smith Dep. 235:14-237:2; handwritten notes marked as ***Exhibit N*** (Smith 000001-14).

113.    Smith's June 2019 notes state that, if you are a hard worker, GM does not care if you are a Black person or White person. Exhibit N at Smith 000001. The notes state, in pertinent part:

> Institutional Bully. All his bosses, co workers, and Team Members Know he is, but isn't doing anything to stop it cause he's a hard worker, and, as long as you a hard worker, they don't care what you do if you are white, or a black person who is black person who work breaks, and snitches on other people, and bow down to thier behaviors. The only black

**VI.    SMITH'S COMPLAINTS TO THE UNION**

114.    Smith testified that, when he first started to experience harassment at GM, he reported the harassment to his UAW Committeeman, Rick Edmonson. *See* Smith Dep. at 57:9-17. A committeeman is a union representative who assists members of the union with issues related to their employment with GM. *See* Smith Dep. at 58:13-19.

115.    Smith was aware that union members could request a "6a Call," which is a request to speak with a union representative who is supposed to help deal with employees who think they have been the subject of discrimination or harassment. *See* Smith Dep. at 61:13-22. Smith testified he had requested and received a 6a Call on approximately three to four occasions. *See* Smith Dep.

at 62:2-15.  Denise Black (Female/Black) is the UAW representative who is the 6a representative at GM. *See* Smith Dep. at 163:5-9.

116.    Smith has also filed grievances with the union related to the incidents with Dan Bold and Tracy Cook. *See* Smith Dep. at 90:20-23.

**VII.    SMITH'S COMPLAINTS TO GM**

117.    Smith testified that, in addition to making complaints through the UAW committeeman, Smith knew he could use the GM AwareLine to report his concerns to GM. *See* Smith Dep. at 58:24 – 59:3.

118.    Smith submitted multiple complaints to GM's AwareLine, and attached some of his handwritten notes as a part of one of the complaints. *See* AwareLine Reports attached as **Exhibit P**.

119.    As a part of one of the AwareLine complaints by Smith, Labor Representative Al Renaud ("**Renaud**") conducted an investigation into Smith's allegations, and prepared written summaries of the interviews conducted during the investigation. *See* Interview Summaries attached as **Exhibit Q**; Smith Dep. at 266:10-267:16.  Smith admits to participating in an interview as a part of Renaud's investigation. *Id.*

120.    Smith testified at deposition that Renaud handled his AwareLine complaint investigation as he would have expected it to be handled. *See* Smith Dep. at 268:20-25.

121.    Smith testified he had also complained to the Labor Department that his co-worker/counterpart (also an hourly, union employee), Beau Williams, had cursed at him. Renaud told him he might have to move him to another department if he continued to have problems with his work partner, Beau Williams. *See* Smith Dep. at 94:4-16; 94:23 – 95:1; 95:23-96: 6. Smith said Renaud told him "if you all can't get along, I will have to move – I'll have to move you." *See*

Smith Dep. at 96:7-23.  Smith interpreted the move as some type of "discipline."  *See* Smith Dep. at 97:2-7.

122.     Renaud never mentioned Smith's race. *See* Smith Dep. at 93:18-20.

123.     Renaud never told him he would be disciplined or terminated related to the complaints he was filing. *See* Smith Dep. at 92:8-13.

VIII.     *CHARGE OF DISCRIMINATION*

124.     In his Complaint, Smith alleges that the harassment against him increased after he filed his EEOC complaint and reported the swastika on the Plant door. *See* Complaint [Doc #5] at ¶ 42.

125.     Smith filed a Charge of Discrimination ("*Charge*") with the Equal Employment Opportunity Commission ("*EEOC*") on June 17, 2019. *See* Smith Dep. at 167:11-22;  Charge of Discrimination marked as *Exhibit R* (Smith 000015). The Charge was signed and dated June 17, 2019. *Id.* The Charge was dual-filed with the Missouri Commission on Human Rights ("*MCHR*"). *Id.*

126.     The Charge states that the earliest date of discrimination was June 8, 2017, which Smith testified was the date of the Safety Vest Incident. *See* Smith Dep. at 169:23-170:4.  That incident occurred more than two years before the Charge was filed. *See* Exhibit R.

127.     The narrative of the Charge states that the alleged harassment and discrimination began on May 15 2017 (which corresponds to the Box Cutter Incident); the last incident described in the Charge allegedly occurred on June 8, 2017. *See* Exhibit R.

128.     The Charge does not allege any incidents of harassment or discrimination after June 8, 2017. *See* Exhibit R.

129.    Smith's claims of harassment and discrimination are based on his race, Black. *See* Smith Dep. at 17:1-8.

130.    The EEOC issued a Notice of Right to Sue on June 21, 2019. *See* Smith Dep. 213:3-21; Notice of Right to Sue (EEOC) (Smith 000016-17) marked as ***Exhibit T***.

131.    The MCHR issued a Notice of Right to Sue on December 13, 2019. *See* Smith Dep. 213:3-21; Notice of Right to Sue (MCHR) (MCHR 00001) marked as ***Exhibit U***.

132.    Plaintiff filed his Petition for Damages in the Circuit Court for St. Charles County, Missouri on March 11, 2020. *See* Complaint [Doc #5].

133.    Smith testified that, after filing his Charge on June 17, 2019, he was not subjected to retaliation for filing the Charge. *See* Smith Dep. at 301:3-19.   Smith testified if someone at GM was retaliating against him for filing his Charge, it is something he would have remembered. *See* Smith Dep. at 301:20-302:2.

134.    Smith was not terminated, transferred or demoted following the filing of his Charge or his lawsuit. *See* Herina Dec. at ¶ 20.

135.    No one at General Motors ever told Smith that he should not go to the EEOC or file a Charge of Discrimination. *See* Smith Dep. at 180:1-5.

136.    No one at General Motors ever told Smith that he should not file a lawsuit against General Motors. *See* Smith Dep. at 180:6-9.

137.    Smith has not made any complaints to GM of harassment, discrimination or retaliation on or after the date he filed his EEOC Charge on June 17, 2019. *See* Herina Dec. at ¶ 21.

138.    Smith was never disciplined  as a result of reporting any workplace conduct  or concerns to GM. *See* Herina Dec. at ¶ 22. Smith  currently has no discipline  on his employment record. *See* Herina Dec. at ¶ 22.

139.    During his employment,  Smith was not demoted or transferred to a position  with lesser pay. *See* Herina Dec. at ¶ 23.

140.    During his employment,  Smith has continued  to receive all compensation  and benefits due to him under the collective  bargaining  agreement between GM and the UAW. *See* Herina Dec. at ¶ 24.

Respectfully  submitted,

OGLETREE,  DEAKINS, NASH,
SMOAK & STEWART, P.C.

/s/ *Melissa M. Pesce*
James M. Paul, #44232MO
Melissa M. Pesce, #46814MO
7700 Bonhomme  Avenue, Suite 650
St. Louis, MO 63105
Telephone:  314.802.3935
Facsimile:  314.802.3936
james.paul@ogletree.com
melissa.pesce@ogletree.com

ATTORNEYS FOR DEFENDANT
GENERAL MOTORS LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2022, the foregoing was electronically filed with the Court service was made through the electronic filing system to:

Aryka N. Moore, Esq.
Weathers Law LLC
462 North Taylor, Suite 105
St. Louis, MO 63108

ATTORNEY FOR PLAINTIFF


/s/ *Melissa M. Pesce*
ATTORNEY FOR DEFENDANT
GENERAL MOTORS